**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

Nicholas Ritter, by and through )
his parent, Kenneth Ritter, )
and Kenneth Ritter, in his own right )　　　Civil Action
 )
**Plaintiffs,** )　　　No. _2:22-cv-1407_____
 )
v. )
 )
Passavant Memorial Homes, )
 )　　　JURY TRIAL DEMANDED
 )
**Defendants.** )
 )
 )

## <u>COMPLAINT</u>

As set forth below, Plaintiffs, Nicholas Ritter (hereinafter "Nicholas" or "Nicholas

Ritter"), by and through his natural father, Kenneth Ritter, (hereinafter "Mr. Ritter," "Father," or

"Kenneth Ritter") and Kenneth Ritter in his own right, by and through counsel, Lisa Postlewait,

Esq., Kristen C. Weidus, Esq., and Ruder Law, LLC, claim violations of the Americans with

Disabilities Act (ADA), 42 U.S.C. §§12181-89, and its implementing regulations, as well as the

implementing regulations of Section 504 of the Rehabilitation Act of 1973.  Specifically,

Plaintiffs rely upon Title III of the ADA, 42 U.S.C. §§12181-89; 34 C.F.R. 300.516, and Title IV

of the ADA, 42 U.S.C. §12203. Plaintiffs allege that Defendant discriminated against Nicholas

Ritter on the basis of his disability, denying him the full and equal enjoyment of the benefits of

and participation in Defendant's program.  Plaintiffs further allege that Defendant discriminated

against Kenneth Ritter in retaliation for his advocacy on behalf of his son. And finally, Plaintiffs

allege that Defendant retaliated against Nicholas Ritter in response to his Father, Kenneth

Ritter's advocacy on his behalf. Lastly, Plaintiffs also include a state law negligence claim on the

basis that Defendant was negligent in its care and supervision of Nicholas as well as its hiring, supervising, training and monitoring and/or conducting reviews of staff and personnel.

## PRELIMINARY STATEMENT

1. This is an action brought by Kenneth Ritter on behalf of his son, Nicholas Ritter, who is an individual with a disability.

2. This action is also brought by Kenneth Ritter on his own behalf.

3. This action alleges a violation of Title III of the ADA, 42 U.S.C. §§12181-89.

4. This action alleges a violation of Title IV of the ADA, 42 U.S.C. §12203.

5. In addition, this action alleges a violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

6. This action also brings forth a state law claim of negligence.

7. Plaintiffs allege that Defendant, Passavant Memorial Homes, discriminated against Nicholas Ritter on the basis of his disability by denying him full and equal enjoyment of the benefits of and participation in Defendant's programs and activities.

8. Plaintiffs further allege that Defendant discriminated against Kenneth Ritter by retaliating against him in response to his advocacy on behalf of his son, Nicholas Ritter.

9. Additionally, Plaintiffs allege that Defendant retaliated against Nicholas Ritter in response to his father, Kenneth Ritter's, advocacy on his behalf.

10. Lastly, Plaintiffs allege that Defendant was negligent in its failure to keep its premises reasonably safe from and free from hazards, negligent in its hiring of employees, negligent in its supervision of its residence, that it failed to maintain health and safety policies, failed to provide adequate care, and neglected to adequately care for Nicholas.

11.   Plaintiffs now request compensatory damages, punitive damages, attorneys' fees, and other appropriate relief.

## PARTIES

12.   Plaintiff Nicholas Ritter is a resident of New Castle, Pennsylvania.  He is currently nineteen (19) years old, and he previously resided in Passavant Memorial Homes facilities.  Nicholas is an individual with a disability, having been diagnosed with moderate intellectual disabilities and autism.

13.   Plaintiff Kenneth Ritter is the father and Legal Guardian of Nicholas Ritter and is a resident of New Castle, Pennsylvania.

14.   Defendant Passavant Memorial is a private, non-profit human service agency that provides residential, educational, recreational, vocational, and spiritual opportunities to those they serve within their local communities with its principal place of business at 163 Thorn Hill Road, Warrendale, PA 15086.

## JURISDICTION AND VENUE

15.   This Court has jurisdiction pursuant to 28 U.S.C. §1331.

16.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendant has sufficient minimum contacts with the venue, including a branch office in the venue, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the venue.

17.   The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims brought pursuant to Pennsylvania state law because such claims arise from the same set of operative facts as those claims brought pursuant to the claims arising under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. The facts

underlying all claims herein raised are so related that they create the same case and controversy.

## **FACTUAL ALLEGATIONS**

18. Nicholas Ritter is an individual with moderate intellectual disabilities and autism that substantially limit him in one or more major life activities including, but not limited to, brain function and his ability to interact with others.

19. Nicholas is a qualified individual with a disability under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act.

20. Plaintiff Kenneth Ritter is a resident of New Castle, Pennsylvania. His son Nicholas Ritter previously attended Defendant's program.

21. Defendant regards Nicholas Ritter as having a disability within the meaning of the ADA and Section 504, as they acknowledge his autism and intellectual disability, and recognize that these diagnoses limit one or more of his major life functions.

22. Furthermore, Defendant's program was specifically designed for children and young adults who are diagnosed with autism spectrum disorder, developmental, and intellectual disabilities and who are moderately to significantly impaired. By permitting Nicholas Ritter to participate in their program, Defendant recognized and acknowledged his qualifying disability.

23. Defendant is a leading human services provider that offers a comprehensive array of support services to address the unique needs of individuals with intellectual disabilities, autism, and behavioral health needs, while promoting choice and independence.

24. Further, Defendant "has been dedicated to empowering the individuals [they] serve to live successfully in their communities." Passavant Memorial Homes Family of Services

(PMHFOS) "has evolved into an innovative service organization that consistently exceeds the expectations of individuals, families, and the community."

25. Defendant is a private, non-profit human service agency that provides residential, educational, recreational, vocational, and spiritual opportunities to those they serve within their local communities.

26. It is Defendant's mission to "empower individuals with intellectual disabilities, autism, and behavioral health needs to live successfully in the community. Through a continuum of care, the highest quality supports are always provided, while promoting choice and independence."

27. Furthermore, Defendant provides community residential services, children's services, long-term structured residences, adult training facilities, older adult living programs, home and community services, life-sharing through family living, behavioral supports, enhanced personal care home, supported living, and trauma-informed care initiatives.

28. Thus, Defendant is a place of public accommodation under Title III of the ADA, 42 U.S.C. § 12182, as it operates as a place of training and education and a community and social service center for children and adults with disabilities.

29. To participate in Defendant's program, participants utilize Adult Autism, Consolidated, and Person/Family Directed Support Home and Community-Based Waivers, which are approved by the Centers for Medicare and Medicaid Services under Section 1915(c) of the Social Security Act (42 U.S.C. §1396n) and are designed to help people with an Autism and intellectual disabilities live more independently in their homes and communities. Therefore, Defendant is a recipient of federal funding, and thus is subject to the Rehabilitation Act.

30.     Kenneth Ritter admitted Nicholas Ritter into Defendant's residential program for children with disabilities on or around February 9, 2016. Nicholas was 13 years old.

31.     Defendant placed Nicholas in its "Baldwin B" Children's Program.

32.     Nicholas is non-verbal but he responds to simple commands.

33.     His diagnoses included autism, ADHD, intellectual disabilities, and flat feet.

34.     Soon after Nicholas Ritter started attending Defendant's program, Kenneth Ritter had concerns about proper supervision. Nicholas would often spend weekends with his father, but Nicholas would be sent to Mr. Ritter's home with other residents' clothing, with his socks on backwards, and Nicholas' personal items and clothing would frequently go missing without explanation.

35.     In addition, in 2017 Nicholas Ritter had acne, and he had multiple prescriptions to address acne concerns.

36.     Upon information and belief, Defendant did not ensure Nicholas was administered his topical acne medication.

37.     Nicholas suffered from uncontrolled acne for years until he returned to his father's care in January 2022.

38.     Furthermore, in 2017, 2018, and 2019, Kenneth Ritter purchased a YMCA membership for Nicholas to enable him to go swimming, because Nicholas loved to swim.

39.     Defendant never took Nicholas to the YMCA, and Nicholas never went swimming.

40.     From 2016 to 2021, Defendant took residents on multiple outings and to recreational activities on a regular basis.

41.     However, Defendant refused to take Nicholas on outings, because they said they could not control Nicholas' behaviors.

42.     By June 2016, Nicholas began taking 4mg of Guanfacine a day as the result of a prescription written by Doctor Joseph Pierri from Western Psychiatric Institute and Clinic Children and Adolescent Unit to help manage Nicholas' behaviors.

43.     However, Defendant still refused to take Nicholas off grounds for activities.

44.     In response, Kenneth Ritter asked if there could be additional staff hired to supervise and manage Nicholas' behaviors.

45.     Defendant failed to hire additional staff.

46.     Additionally, Kenneth Ritter offered to secure a Therapeutic Support Specialist ("TSS") to help with Nicholas' behaviors, and to address social and emotional needs in order to permit Nicholas to fully engage in Defendant's activities.

47.     Nonetheless, Defendant declined his offer to secure a TSS.

48.     Mr. Ritter also suggested that Defendant develop a "Behavior Support Plan" for Nicholas.

49.     Upon information and belief, Defendant rejected this suggestion.

50.     Nicholas resided and received services in Defendant's programs from 2016 to 2021, and Nicholas continued to be denied access to outings and activities on and off campus that his peers were able to participate in through Defendant's services.

51.     In March 2020, Nicholas' school shut down as a result of the COVID-19 pandemic.

52.     Mr. Ritter continued to have concerns about Defendant's supervision and care of Nicholas.

53.     Nicholas began gaining a significant amount of weight very quickly.

54.     Mr. Ritter had concerns about staff properly supervising and nourishing Nicholas to ensure he was eating appropriately.

55.    Furthermore, Defendant was supposed to take Nicholas on walks.

56.    Upon information and belief, Defendant failed to take Nicholas on walks and failed to encourage or organize physical activity.

57.    During this period, Nicholas was scheduled to participate in virtual education through the Watson Institute.

58.    The Watson Institute was fully virtual from March 13, 2020 to December 2020.

59.    The Watson Institute implemented a hybrid virtual/in-person schedule in January 2021.

60.    The Watson Institute also closed on multiple occasions due to concerns of COVID-19 exposures.

61.    At the Watson Institute, Nicholas did not participate in a general education program.

62.    Nicholas' participated in special education/life skills programing for one-hundred percent of the school day.

63.    During periods of remote learning, Defendant failed to help Nicholas with virtual education.

64.    From October 30, 2021 to December 21, 2021, Nicholas missed approximately twenty days of in person learning.

65.    During the 2020-2021 school year, the Watson Institute was open for in-person learning 129 out of 180 possible school days.

66.    Throughout the early stages of the pandemic, Defendant restricted all visitation.

67.    Mr. Ritter was not permitted to visit Nicholas, and Nicholas was not permitted to spend time in Mr. Ritter's home.

68.    Mr. Ritter asked for permission to have Nicholas at home for visits, but Defendant refused to accommodate that request, even if Mr. Ritter followed safety protocols.

69.     On August 20, 2020, Mr. Ritter, through Counsel, requested a reasonable accommodation pursuant to the ADA to permit Nicholas to spend time in Mr. Ritter's home.

70.     On September 4, 2020, Defendant agreed that Mr. Ritter could have Nicholas at home with appropriate health and safety protocols in place.

71.     Nicholas' medical history included concerns about Nicholas' digestive system. His doctor approved Nicholas for daily Miralax use to ensure regular bowel movements.

72.     Without explanation, staff informed Mr. Ritter they were taking Nicholas off Miralax.

73.     Then, in April 2021, Defendant informed Kenneth Ritter that Nicholas was not urinating.

74.     Kenneth Ritter took Nicholas to the urologist immediately.

75.     During the April 19, 2021 appointment, Nicholas had a CAT scan.

76.     At that time, they discovered that Nicholas was severely constipated, and his digestive system was blocked.

77.     This caused Kenneth Ritter to have additional concerns about Defendant's supervision and care of Nicholas while he was at their facility.

78.     On November 24, 2021, Defendant called Mr. Ritter to inform him that they had staffing issues related to the pandemic. Defendant asked if Mr. Ritter could take Nicholas home for approximately fourteen days and then have him return to Defendant after Nicholas had a negative COVID test.

79.     On that date, Mr. Ritter's counsel contacted Defendant to voice Mr. Ritter's concerns about the repercussions of this request. His supports coordinator with Lawrence County suggested that removing Nicholas from Passavant for any amount of time could jeopardize Nicholas' access to funding through his Autism waiver.

80.   Previously, Defendant had informed Mr. Ritter that he could keep Nicholas home for up to 180 days and they would reserve his spot at Passavant.

81.   On November 25, 2020, Defendant, through Counsel, informed Mr. Ritter that he could have Nicholas at home for fourteen days and then return him to Defendant after he had a negative COVID test. Defendant assured Mr. Ritter it would not jeopardize Nicholas' consolidated waiver funding.

82.   In August 2021, Nicholas moved into a new residence within Defendant's program.

83.   Nicholas Ritter was moved to Defendant's Maratta Home.

84.   Upon information and belief, Nicholas had difficulty with this transition. Nicholas engaged in property destruction.

85.   Upon information and belief, Defendant failed to document incidents of aggression that included property destruction.

86.   Defendant further failed to notify Kenneth Ritter of self-injurious behavior and/or accidents that caused physical injury to Nicholas.

87.   After Nicholas' move to the Maratta Home, staff informed Kenneth Ritter about Nicholas' night terrors.

88.   Staff stated that Nicholas had been banging his head and engaging in injurious behavior overnight since 2020. These "night terrors" could include screaming, head banging, and scratching.

89.   Had Kenneth Ritter been told about these concerns, he would have taken Nicholas to see his physician and psychiatrist immediately.

90.   On October 12, 2021, Kenneth Ritter participated in a hearing to be appointed as Nicholas' Permanent Plenary Guardian due to Nicholas' incapacity.

91.　Around October 2021, Defendant's staff member, Gary Hickman, talked to Kenneth Ritter about the night terrors and head banging that staff was observing in the middle of the night, and he recommended a psychiatrist appointment.

92.　Kenneth Ritter agreed.

93.　On October 29, 2021, the Court issued a final order that appointed Kenneth Ritter as Nicholas' Permanent Plenary Guardian of the Person and Permanent Plenary Guardian of the Estate.

94.　Upon information and belief, Defendant scheduled a psychiatry appointment with Dr. Ashley Wood from Rochester Health Center Adult Behavioral Health for November 4, 2021.

95.　On or near the November 4, 2021 appointment, Mr. Hickman told Kenneth Ritter that the appointment was canceled.

96.　Kenneth Ritter intended to go to Nicholas' appointment to discuss his concerns.

97.　Kenneth Ritter was later informed by Defendant that Dr. Wood prescribed additional medication and decreased the dosage of Nicholas' daytime medication, without an appointment.

98.　Furthermore, as Nicholas' Guardian, Mr. Ritter had a right to attend appointments and make decisions on his son's behalf.

99.　Inexplicably, Defendant made this decision without informing Mr. Ritter.

100.　Upon information and belief, Nicholas' behaviors increased immediately.

101.　Kenneth took Nicholas off the new medication and requested another appointment immediately.

102.　On November 6, 2021, Nicholas went to Kenneth Ritter's home for a weekend visit.

103. Kenneth Ritter observed a gash on Nicholas' hand and a severe cut on his head.

104. Kenneth Ritter asked Mr. Hickman and another staff person what happened to Nicholas, but Defendant failed to have an explanation for his injuries.

105. Kenneth Ritter asked again for a behavioral specialist to come in to provide services and assistance for Nicholas.

106. Defendant ignored Mr. Ritter's request.

107. Upon information and belief, Nicholas continued to have night terrors.

108. Kenneth Ritter asked for increased supervision, and suggested video surveillance to better understand Nicholas' night terrors and injurious behaviors.

109. Defendant agreed to look into whether surveillance would be permitted.

110. Upon information and belief, Defendant failed to implement any measures to address Nicholas' night terrors and refused to increase supervision or surveillance.

111. In mid-November 2021, Nicholas' school, the Watson Institute, reported to Kenneth that they had concerns about Nicholas' hygiene.

112. Upon information and belief, the Watson Institute reported to Mr. Ritter that they asked Defendant's staff to bring a change of clothing for Nicholas to school in case of an accident. Watson Institute informed Mr. Ritter that they put dirty clothes in a book bag for Defendant to clean after Nicholas had an accident, but Defendant failed to remove Nicholas' dirty clothes from his book bag that week.

113. On November 17, 2021, Dr. Walter Bender, UPMC CCP - ABC Pediatrics discontinued Nicholas' melatonin prescription and prescribed clonidine.

114. However, Kenneth Ritter received bills for melatonin prescriptions on or around December 3, 2021, December 30, 2021, and January 28, 2022.

115.   In addition, on December 6, 2021, Mr. Ritter was charged approximately $8.00 for a prescription for diazepam for an alleged colonoscopy.

116.   Upon information and belief, Nicholas never had a colonoscopy.

117.   Mr. Ritter asked Defendant about this prescription and its purpose, but Defendant could not explain if Nicholas received this medication or why he may have been prescribed it.

118.   On or around December 1, 2021, Nicholas was injured.

119.   Defendant filled out an incident report, but they failed to identify the cause of the injury. They further failed to call Mr. Ritter to tell him that his son had been injured.

120.   On or around December 7, 2021, Mr. Ritter called Defendant to see how Nicholas did the night before.

121.   Upon information and belief, Defendant said Nicholas had "two outbursts." Mr. Ritter asked for additional information, but Defendant did not have any additional details.

122.   On December 9, 2021, Defendant reported to Mr. Ritter that Nicholas hit the wall and himself, and he did not sleep well the previous night.

123.   From 2017 to 2022, Kenneth Ritter had ongoing concerns about Defendant ensuring Nicholas was wearing corrective lenses.

124.   Upon information and belief, Nicholas' school reported that Nicholas was often without his glasses.

125.   In addition, Nicholas was often sent home to Mr. Ritter for weekend visitation without his glasses.

126.   For years, until Nicholas' discharge from Defendant, Mr. Ritter asked for Nicholas' glasses.

127.   Upon information and belief, Defendant reported Nicholas did not have glasses.

128.   Mr. Ritter told Defendant that Nicholas had broken his glasses, and he asked them to get him new glasses.

129.   Upon information and belief, Nicholas never wore, and Mr. Ritter was never presented, with new glasses.

130.   Nonetheless, when Kenneth Ritter discharged Nicholas from Defendant and brought him home to live permanently, Mr. Ritter discovered Nicholas' glasses in a bag full of belongings.

131.   Furthermore, Defendant had a duty to regularly check Nicholas' blood pressure, because of his clonidine prescription.

132.   Upon information and belief, Defendant admitted to Mr. Ritter that staff were not checking or logging Nicholas' blood pressure.

133.   On December 13, 2021, Defendant reported to Mr. Ritter that Nicholas was up screaming the previous night, but Nicholas was fine in the morning, and he went on the school bus without incident.

134.   On December 14, 2021, Defendant reported to Mr. Ritter that Nicholas was up yelling and pounding for approximately thirty minutes. Nicholas did not have any problems for the rest of the night, and he went to school without incident.

135.   On December 15, 2021, Defendant reported to Mr. Ritter that Nicholas was screaming and pounding on the walls the previous night, but he got up in the morning and went to school without any problems.

136.   On December 16, 2021, Mr. Ritter called Defendant to obtain an update about Nicholas' sleep, but staff did not have any information.

137.   On December 17, 2021, Defendant reported to Mr. Ritter that Nicholas yelled throughout the night.

138.   On December 20, 2021, Defendant reported that Nicholas was up one time, he pounded on the wall, and he did not have any problems the rest of the night.

139.   On December 21, 22, and 23, Defendant did not report any concerns about Nicholas' sleep.

140.   Mr. Ritter had Nicholas home for a visit from December 23, 2021 to December 27, 2021.

141.   On December 28, 2021, Defendant reported that Nicholas seemed to sleep well the previous night, but they took him to get bloodwork, and Nicholas had behavioral problems in the doctor's office.

142.   On December 29, 2021, Defendant reported no concerns.

143.   On December 30, 2021, Defendant reported Nicholas was not doing well. Defendant stated Nicholas destroyed property and hurt himself.

144.   From December 31, 2021 to January 3, 2022, Mr. Ritter had Nicholas home with him for a visit. Mr. Ritter did not have any concerns.

145.   On January 4, 7, 13, 15, 20, and 21, 2022, Defendant reported significant concerns about Nicholas screaming, banging on walls, and at times, scratching himself during the middle of the night.

146.   Upon information and belief, Mr. Ritter called for updates about Nicholas' sleep and behaviors on January 11 and 22, 2022, but Defendant did not know how Nicholas did overnight.

147.   Upon information and belief, Defendant failed to appropriately supervise, restrain, and protect Nicholas from harm during his night terrors.

148.   Upon information and belief, on January 12, 2022, Defendant told Mr. Ritter he was not allowed inside Nicholas' home because of "COVID-19 protocol."

149.   Kenneth Ritter's concerns about supervision continued in January 2022.

150.   On January 18, 2022, Nicholas was off school for Martin Luther King Day.

151.   Kenneth Ritter dropped Nicholas off at Defendant after a long weekend, but staff failed to come to the front door.

152.   Upon information and belief, Mr. Ritter stood at the front door, per Defendant's policy, for over five minutes before someone came to the living room.

153.   On January 19, 2022, Kenneth Ritter was at Defendant's facility to be a bus aide for Nicholas to go to school. Mr. Ritter was immediately concerned that Defendant failed to shovel an excessive amount of snow and ice to permit a safe exit and entry.

154.   On January 23, 2022, Mr. Ritter brought Nicholas home to recover after there was a COVID-19 exposure in Defendant's home.

155.   Mr. Ritter had ongoing concerns about Defendant failing to implement medical protocols that included Nicholas having the top of his bed elevated due to concerns of acid reflux.

156.   Upon information and belief, Defendant's staff member, Gary Hickman, stated it was not their job to make this accommodation, because maintenance needed to handle the request.

157.   Upon information and belief, Defendant failed to elevate Nicholas' bed.

158.   The Watson Institute provided Nicholas with an iPad tablet and a cardboard "communication board" to use in Defendant's facility to help Nicholas communicate his wants and needs through pictures and icons.

159.   Upon information and belief, Defendant failed to implement the communication board.

160.   For at least two years, Mr. Ritter asked for a behavioral support plan to be properly
       implemented, but Defendant failed to follow through.

161.   Furthermore, Mr. Ritter repeatedly requested additional staff and support to monitor and
       supervise his son, assist with his behaviors, prevent self-harm, and to remedy concerning
       nighttime behaviors, but Defendant failed to make these accommodations.

162.   Without any options to ensure Nicholas' safety, Mr. Ritter removed Nicholas from the
       Defendant's program in late January 2022.

163.   In other words, Nicholas was constructively forced out of Defendant's program because
       of its unwillingness to appropriately support him. It was no longer safe for him to attend.

164.   When Kenneth Ritter pulled Nicholas from the program, Mr. Ritter had to commit to
       being Nicholas' full-time caregiver and to supervise him twenty-four hours a day.

165.   With Nicholas now at home, Mr. Ritter has been forced to create a self-directed program
       for Nicholas, which has also limited his ability to socialize.

166.   Presently, Nicholas continues at the Watson Institute for school where he is expected to
       remain until his twenty-first birthday.

167.   Mr. Ritter continues to use a Blended Service Coordinator to assist with appointments
       and services.

168.   Since Nicholas has returned home, Nicholas' digestive problems have not been a
       concern.

169.   Furthermore, Nicholas' acne is now clearing up.

170.   With Nicholas now at home, Mr. Ritter employs two professionals to provide wrap
       around services to Nicholas a total of four days a week for approximately five hours per
       session. Wrap around services are for children who have autism or other serious

emotional or behavioral problems. It involves a team of trained professionals who work to help improve behaviors. A mobile therapist (MT) may meet with the client and other members of the family for individual mental health counseling at home or at school, and a specially trained staff support person (TSS) may work every day, or a few days a week at home, in school or in the community, to help change problematic behaviors.

171.   Nicholas is now attending Planet Fitness with his wrap around staff multiple days each week.

172.   Nicholas is engaging in regular recreational activities without significant behavioral issues.

173.   Nicholas lost the extra weight he gained during the early stages of the COVID-19 pandemic, approximately fifteen pounds.

### COUNT ONE: VIOLATION OF SECTION 504
### Nicholas Ritter v. Passavant Memorial Homes

174.   The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

175.   Under Section 504 of the Rehabilitation Act:

> No otherwise qualified individual with a disability…shall,
> solely by reason of his or her disability, be excluded from the
> participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving
> Federal financial assistance…  29 U.S.C. §794(a);
> 34 C.F.R. §104.4(a)

176.   More specifically in the instant case, 34 C.F.R. §104.4(b)(i) applies, which prohibits an organization from "deny[ing] a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service."

177.   Defendant receives federal funding, and its educational, recreational, and community-based activities qualify as a program or activity within the meaning of the Rehabilitation Act and its implementing regulations.  34 C.F.R. §104.38(k).

178.   Defendant denied Nicholas Ritter the opportunity to participate in its program because of his status as a person with a disability.

179.   The intent of the Rehabilitation Act, in addition to prohibiting disparate treatment of an individual based on the existence of a disability, is to "prohibit discrimination against one 'subgroup' of disabled people as compared to another subgroup if the characteristic distinguishing the two subgroups is the nature of their respective disability."  S.K. v. North Allegheny S.D., 2015 WL 7308671 *6 (November 19, 2015).

180.   Nicholas Ritter is an otherwise qualified individual under the Rehabilitation Act, as he would remain able to access Defendant's program if they had made reasonable accommodations.  Id.

181.   Defendant intentionally and unlawfully denied Nicholas Ritter the opportunity to participate in all elements of its program by preventing him from participating in recreational, physical, and social activities because of his emotional and behavioral needs.

182.   As a result of Defendant's actions, Nicholas Ritter suffered consequential damages, including pain and suffering and emotional harm and distress.

183.   The Defendant, by virtue of its conduct described herein, discriminated against Nicholas Ritter because of his disabilities and in violation of Section 504 of the Rehabilitation Act.

## COUNT II: VIOLATION OF TITLE III OF THE ADA
### Nicholas Ritter v. Passavant Memorial Homes

184.   The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

185.   Title III of the ADA clearly states:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.  42 U.S.C. §12182.

186.   Defendant is a public accommodation under Title III of the ADA, as it utilizes and leases places of public accommodation for its events and activities.

187.   Defendant prohibited Nicholas Ritter from accessing its activities, thus discriminating against Nicholas on the basis of his disabilities.

188.   Title III of the ADA further states:

> It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association. 42 U.S.C. §12182(b)(1)(E).

189.   Defendant prevented Kenneth Ritter from entering the building to assist Nicholas, which negatively impacted his ability to participate in their program.

190.   Defendant failed to hire appropriate staff to manage Nicholas' behaviors, implement a behavioral support plan, or permit Mr. Ritter to provide additional assistance for Nicholas to engage in Defendant's recreational, educational, and social programs and services.

191.   Defendant, by virtue of its conduct described herein, discriminated against Nicholas Ritter because of his disabilities and in violation of Title III of the Americans with Disabilities Act.

## COUNT III: VIOLATION OF TITLE IV OF THE ADA
### Kenneth Ritter v. Passavant Memorial Homes

192.  The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

193.  Title IV of the ADA clearly states:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. 42 U.S.C. §12203.

194.  Defendant retaliated against Kenneth Ritter by enforcing an unwritten policy to prevent him from entering its building. This policy was implemented in direct response to Kenneth Ritter's advocacy on behalf of his son, Nicholas.

195.  Kenneth Ritter opposed his son's treatment by Defendant's program. Defendant responded by preventing him from entering the building to support his son.

196.  Defendant, by virtue of its conduct described herein, discriminated against Kenneth Ritter in response to his advocacy on behalf of Nicholas in violation of Title IV of the Americans with Disabilities Act.

## COUNT IV: VIOLATION OF TITLE IV OF THE ADA
### Nicholas Ritter v. Passavant Memorial Homes

197.  The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

198.  Title IV of the ADA clearly states:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. 42 U.S.C. §12203.

199.   Defendant retaliated against Nicholas Ritter by constructively removing him from their program in response to his father's advocacy on his behalf.

200.   Kenneth Ritter opposed his son's treatment by Defendant's program. Defendant responded by constructively forcing Nicholas out of its program through its failure to appropriately support him.

201.   Defendant, by virtue of its conduct described herein, discriminated against Nicholas Ritter in response to Kenneth Ritter's advocacy on behalf of Nicholas in violation of Title IV of the Americans with Disabilities Act.

## COUNT V: NEGLIGENCE
## Nicholas Ritter v. Passavant Memorial Homes

202.   The averments set forth in each of the preceding paragraphs are incorporated by reference here as though fully set forth at length.

203.   At all relevant times, Nicholas Ritter was enrolled in Defendant's residential home for children with disabilities, and he was under the care, custody, and control of Defendant.

204.   The four elements of a negligence claim under Pennsylvania law are as follows: "a duty to conform to a certain standard for the protection of others against unreasonable risks; the defendant's failure to conform to that standard; a causal connection between the conduct and the resulting injury; and actual loss or damage to the plaintiff." Brewington for Brewington v. City of Philadelphia, 199 A.3d 348 (Pa. 2018).

205.   Defendant owed a duty to Plaintiff through a preexisting duty of care. The Defendant, as a private, non-profit human service agency that provides residential services to children with disabilities has a special relationship to ensure all residents, including Nicholas, are safe and have their emotional and physical well-being protected while on its. Defendant

breached its duties to Plaintiff through its negligence, carelessness, and recklessness, generally and in the following particulars:

a.      Failing to exercise sufficient control over Nicholas to protect him;

b.      Failing to supervise employees who had a duty to care, protect, and ensure Nicholas' safety, and to report all incidents and injuries to his family;

c.      Failing to formulate policies, procedures, and regulations to govern staff and personnel to provide a safe environment for clients;

d.      Failing to supervise and to protect Nicholas from self-injurious behaviors;

e.      Failing to use due care in hiring, supervising, training, monitoring and/or conducting reviews of staff and personnel; and

f.      Failing to provide adequate medical care and notice to family members.

206.   More specifically, Defendant had a duty to ensure Nicholas took prescribed medications.

207.   Furthermore, because of Nicholas' disability status and status as an incapacitated person in Defendant's care, Defendant had a duty to ensure Nicholas took Miralax, had regular bowel movements, appropriate clothing, and adequate nutrition.

208.   Defendant further failed to ensure Nicholas had access to and wore his corrective lenses.

209.   Defendant had an additional duty to supervise, aide, and ensure Nicholas used his prescribed acne medication daily.

210.   Defendant also had a duty to ensure Nicholas engaged in regular physical activity, including walks around Defendant's grounds.

211.   Moreover, Defendant had a duty to supervise and protect Nicholas, as a minor child and young adult with an intellectual disability, from self-injurious behavior during the day and while he slept.

212. Defendant's failure to ensure Nicholas used his prescribed medication, engaged in physical activity, had clean and appropriate clothing, worse his glasses, and was safe from self-injurious behavior was a direct result of its failure to appropriately hire, train, monitor, and discipline staff.

213. As a result of the Defendant's actions and inactions, Plaintiff has suffered damages including but not limited to emotional anguish, inconvenience, mental anguish, physical manifestations of emotional duress, emotional and psychological trauma, and financial loss.

**WHEREFORE**, Plaintiffs request that this Honorable Court enter judgment in their favor and against Defendant as follows:

a) A declaratory judgment stating that Defendant discriminated against Nicholas Ritter by denying him access to its programs and services, as well as in failing to engage in a cooperative process regarding the provision of reasonable accommodations to permit continued access, in violation of Title III of the ADA and Section 504 of the Rehabilitation Act;

b) A declaratory judgment stating that Defendant retaliated against Kenneth Ritter by denying him access to its facilities, which prohibited him from participation in Nicholas' care, after he objected to Defendant's treatment of his son, in violation of Title III and IV of the ADA;

c) A declaratory judgment stating that Defendant retaliated against Kenneth Ritter in violation of Title IV of the ADA;

d) A declaratory judgment stating that Defendant was negligent in its care and supervision of Nicholas Ritter as well as in its hiring, supervising, training, monitoring and/or conducting reviews of staff and personnel;

e) Compensatory damages;

f) Attorneys' fees and costs; and

g) Such other relief as this Honorable Court deems appropriate.

Respectfully Submitted,

Ruder Law, LLC

*/s/ Lisa Postlewait*
Lisa Postlewait, Esq
Attorney I.D. No. 309606
One Oxford Center
301 Grant Street, Suite 270
Pittsburgh, PA 15219
(412) 281-4959
Date: October 7, 2022                    Email: lisapostlewait@ruderlaw.com